Michael E. Begley
Gerry Fagan
MOULTON BELLINGHAM PC
Suite 1900, Crowne Plaza
P. O. Box 2559
Billings, Montana 59103-2559
Telephone (406) 248-7731
Mike.Begley@moultonbellingham.com
Gerry.Fagan@moultonbellingham.com

Attorneys for Defendant American Title and Escrow

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| FLAGSTONE DEVELOPMENT, LLC, an Arizona limited liability company, and LAWRENCE A. HEATH,<br><br>Plaintiffs,<br><br>-vs-<br><br>WAYNE JOYNER, JUSTIN JOYNER, as individuals; ROCKY MOUNTAIN TIMBERLANDS, LLC, a Montana limited liability company, WAYNE MARCHWICK, AMERICAN TITLE AND ESCROW, a Montana corporation, FIRST AMERICAN TITLE COMPANY, a California corporation, DEVELOPER FINANCE CORPORATION, a Massachusetts corporation, NICHOLAS POWERS, III, a/k/a NICHOLAS D. POWERS, JAKE KORELL, LANDMARK OF BILLINGS, INC., a Montana corporation, JON USSIN, U BAR S REAL ESTATE, a Montana corporation, and JOHN DOES 11 through 30,<br><br>Defendants. | Cause No. CV-08-100-BLGRFC<br><br><br><br>**DEFENDANT AMERICAN TITLE AND ESCROW'S COMBINED BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON DAMAGES & MOTION TO EXCLUDE PLAINTIFFS' DAMAGES EXPERT DALE GRABOIS** |

In this case, Plaintiffs claim that, but for the alleged conduct of the various Defendants, they would have sold over 40 million dollars in twenty-acre lots in only 3 years near Roundup, Montana, and would have made nearly 18 million dollars in profits. Plaintiffs seek those allegedly lost

development profits as damages in this case. Plaintiffs disclosed a damages expert, Dale Grabois, as the support for their damages claim.

Both Plaintiffs' damages claim for lost development profits and the opinion of Grabois are hopelessly speculative, and both fail as a matter of law. Grabois' damages opinion and Flagstone's lost development profits claim are based on nothing more than some investment projections and estimates made by Plaintiff Heath (which ultimately turned out to be significantly inaccurate), and Grabois' opinion is merely an inadmissible "take my word for it, the damages are reasonable" stab at an expert opinion. Plaintiffs' damages claim should be dismissed pursuant to American Title & Escrow's Motion for Partial Summary Judgment, and Grabois' opinion should be excluded from evidence pursuant to American Title's Motion to Exclude.

## STATEMENT OF FACTS

Plaintiffs disclosed Dale Grabois as an expert on Plaintiffs' damages. (Statement of Undisputed Facts ("SOF"), ¶ 1) Grabois' C.V. indicates he has not practiced as an accountant since 1990. (*Id.*) Plaintiffs served an expert Report for Grabois' lost development profits opinion. (SOF ¶ 2) Grabois opines in his Report that Plaintiffs' total damages consist of lost development profits in the amount of $17,709,985.50. (SOF ¶ 3)

Grabois calculated all of the alleged lost profit damages in only one full page in his Report. (SOF ¶ 3) Other than a C.V., Grabois' Report had no attachments, no exhibits, and virtually no calculations. (SOF ¶ 2) Grabois merely stated a variety of bald financial estimates, such as what he said gross sales, costs, and "post-development cash flows" would allegedly have been. (*Id.*) Grabois did not even bother to provide his source for his estimates. (*Id.*)

For example, Grabois stated "the development would have brought in

$40,150,000 in Gross Sales." (SOF ¶ 3) Similarly, Grabois stated "[c]osts would have been $25,900,000." (*Id.*) Grabois did not provide any basis, authority, or support to demonstrate how he came up with his Gross Sales or cost estimates, or any of his other estimates; he just said that is what they were, and left the reader to figure out how he came up with them. (*Id.*)

A review of the materials in his Report which Grabois claimed to have reviewed indicates Grabois concocted his opinion by simply reading, and copying from, an investment prospectus issued by Flagstone to potential investors. (SOF ¶ 2) For example, Flagstone's prospectus projected total gross sales of $40,150,000. (SOF ¶ 4, at p. 17) So did the Grabois' Report. (SOF ¶ 2, at p. 5) Flagstone's prospectus also projected sales of 585 lots in three phases, with escalating lot prices in each phase from $65,000 to $68,000 to $72,000. (SOF ¶ 4, at p. 17) So did the Grabois' Report. (SOF ¶ 2, at p. 4 & p. 5)

Flagstone's also estimated development costs, including purchase costs, commissions, operating expenses, marketing costs, and loan costs, of $25,900,000. (SOF ¶ 4, at p. 19) So did the Grabois' Report. (SOF ¶ 2, at p. 5) The prospectus estimated a gross profit of $14,250,000, and so did the Grabois' Report. (SOF ¶ 4, at p. 19; SOF ¶ 2, at p. 5) Flagstone's prospectus then deducted a projected $865,000 interest payment, and split the remaining "profit" equally between the prospective investors and the developer in order to come up with a projected sales profit of $6,692,500. (SOF ¶ 4, at p. 21) This is exactly what the Grabois' Report did too. (SOF ¶ 2, at p. 6)

The prospectus also estimated "post-development cash flows" for years four through eighteen of $19,001,747. Most of this estimated cash flow came from seller-financed lot sales, based on the prospectus' estimate that 60% of

all lot sales would be financed by Flagstone at 10.75% interest. (SOF ¶ 4, at p. 21) The prospectus further estimated management fees in the amount of $660,000 which Flagstone could might earn during the first eighteen years of the development. Grabois adopted and copied every one of these estimates, too. (SOF ¶ 4, at pp. 18 & 21; SOF ¶ 2, at p. 6)

Finally, Grabois adopted from Flagstone's prospectus a 2 percent commission on every lot sale for Flagstone. (SOF ¶ 4, at p. 16; SOF ¶ 2, at p. 6) However, Grabois appears to have made a mathematical mistake in doing so. The prospectus, and Grabois, project total lot sales for all 585 lots to be $40,150,000, so 2 percent of lots sales should be $803,000. Grabois calculated the 2 percent commission at $856,612. Since the Grabois Report contained no exhibits, no supporting calculations, and no other information which explained the basis for the commission calculation, it is impossible to know how Grabois actually calculated it; all the Grabois Report provided was the bald conclusion that 2 percent of total lot sales equaled $856,612. (SOF ¶ 2, at p. 6) Nevertheless, Grabois appears to have erred in the calculation of the projected sales commissions.

Grabois then simply totaled up the six projections he copied out of Flagstone's prospectus to come up with his "Total Lost Profit" number of $17,709,985.50, and stated it looked "reasonable" to him. (SOF ¶ 2, at p. 6)

In addition to the problem that Grabois merely copied down numbers from Flagstone's investment prospectus, there are other obvious problems with Grabois' reliance on the prospectus. First, the prospectus which Grabois relied upon and copied as the basis for his damages opinion came straight from Plaintiff Heath. Heath prepared the prospectus himself. (SOF ¶ 5) He wrote the prospectus in late September to mid October, 2007. (SOF ¶ 6)

Therefore, Grabois' opinion adopted Plaintiffs' <u>own</u> projections and repackaged them under the guise of an "expert opinion."

Second, the prospectus was only an estimate or a projection in the first place, and turned out to be based upon incorrect information about the development. For instance, Heath learned approximately five to six months after writing the prospectus that due to drainage issues the land for Flagstone's planned development would not sustain the projected 585 lots. Instead, the land would sustain only 449 develop-able lots. (SOF ¶ 7) Accordingly, Heath told his financial planners to reduce the projected lot numbers in their ongoing financial projections to 449 lots. (*Id.* at p. 1) Yet Grabois stuck with the original 585 lot estimate in his opinion and deemed it reasonable. (SOF ¶ 2, at p. 6)

Heath also subsequently learned that due to pending Musselshell County planning requirements to mandate professionally engineered roads and drainage systems, engineering costs to construct the roads in Flagstone's planned development would be far higher than originally projected, perhaps as much as $200,000 per mile. (SOF ¶ 9) Heath admitted in his deposition that the costs projected in the prospectus subsequently ended in a "complete state of disarray," and the projected numbers in the prospectus were not reliable as a result. (SOF ¶ 10) Heath further admitted his projections in his prospectus were "completely undone" by the drainage issue which reduced the actual number of saleable lots for his project. (SOF ¶ 11) And Heath admitted in another email in April, 2008, the new requirements made his planned development "economically unfeasible (sic)":

> [The County's new planning requirement] triples the road construction costs of the planned development and makes the project economically unfeasible. It also spells the end of land development in the county. They just don't know it yet.

(SOF ¶ 12)  Similarly, Heath admitted in an email in March, 2008, that the "numbers" no longer worked for his cash flow model due to the subsequent changes, including fewer lots for sale and lower sales values, among other issues.  (SOF ¶ 13)

Nevertheless, Grabois stuck entirely to the original speculative projections contained in the prospectus.

## ARGUMENT

Grabois damages opinion is far too unreliable to be admissible and should be excluded from evidence or testimony.  He based it on nothing more than speculative financial estimates which turned out to be inaccurate in the end.  Similarly, Plaintiffs' damages claim for alleged lost development profits is nothing but speculation and should be dismissed.

**I.     GRABOIS' DAMAGES OPINION IS NOT ADMISSIBLE.**

Grabois' proposed expert opinion testimony on alleged damages incurred by Plaintiffs should be excluded.  Grabois' opinion cannot satisfy the standards for reliability imposed under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993) (expert's testimony must rest on reliable foundation).  Grabois' proposed opinion testimony is nothing more than unsupported speculation disguised as an expert opinion.

Plaintiffs in this case bear the burden of establishing the admissibility of Grabois' proposed expert opinion testimony on damages.  *See Daubert, supra*, 509 U.S. at 592, nt. 10.  The admissibility of expert testimony is governed by Federal Rule of Evidence 702.  The determination of whether expert testimony is admissible under Rule 702 is not an issue of fact subject

to the summary judgment standards. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997) (proper standard is abuse of discretion standard).

Rule 702, as interpreted by the United States Supreme Court in *Daubert* as well as the Ninth Circuit, established several standards for admissible expert testimony. The standards set forth in *Daubert* are to be applied to all expert testimony, not just to "scientific" expert testimony. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147 (1999). First, "Rule 702 requires that the evidence 'assist the trier of fact,' or in other words, that it be relevant." See *Guidroz-Brault v. Missouri Pac. R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001), *citing Daubert,* 509 U.S. at 591. Second, Rule 702 "demands that the evidence be reliable." *See Id.*, *citing Daubert* at 590.

Rule 702 requires district court judges to act as gatekeepers and to screen expert testimony both for reliability and relevance. *See Daubert*, 509 U.S. at 590-91. The gatekeeping function requires more than simply "taking the expert's word for it." *See e.g., Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) ("*Daubert II*").

The Supreme Court, the Ninth Circuit, and the District Court of Montana have all specifically ruled that admissible expert testimony does not include unsupported speculation and subjective belief. *See Guidroz-Brault*, 254 F.3d at 829*, citing Daubert* at 590; *see also, Claar v. Burlington Northern R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994) (affirming exclusion of experts' opinion testimony because experts failed to demonstrate conclusions were based upon anything more than "subjective beliefs and unsupported speculation"); *United States v. W.R. Grace*, 455 F. Supp. 2d 1181, 1187 (D. Mont. 2006). As a consequence, it is well-settled that an expert's testimony should be excluded where it is based on subjective belief or unsupported speculation

7

which amounts to no more than a bald conclusion (sometimes called an "*ipse dixit*" opinion*)* or guesswork.  *See General Electric*, 522 U.S. at 146 (holding that trial court may properly exclude *ipse dixit* opinions);  *Domingo ex rel. Domingo v. T.K.,* 289 F.3d 600, 607 (9th Cir. 2002) (affirming the exclusion of *ipse dixit* testimony of plaintiff's expert which was not based upon objective, verifiable evidence);  *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1407 (D. Or. 1996) (excluding expert opinion because it was "no more than educated guesses dressed up in evening clothes").  District Judge Molloy accurately summarized the *ipse dixit* standard as an "expert's 'bald assurance of validity is not enough.' "  *See W.R. Grace*, at 1187*, citing Daubert II*, 43 F.3d at 1316.

In this case, Grabois' proposed expert opinion on alleged damages incurred by Plaintiffs is the epitome of an unreliable, bald conclusion.  Grabois calculated his opinion that Plaintiffs' damages were $17,709,985.50 in approximately one full page in his Report.  Essentially all Grabois did to allegedly form an "expert" opinion on Plaintiffs' damages was to review Flagstone's prospectus, copy down numbers from it, add them up, and state that they seemed "reasonable and supported" to him.  (*See* SOF ¶ 2, at p. 6)  Anyone with a calculator and access to the prospectus could have done what Grabois did;  as a result, Grabois' opinion is not a proper expert opinion.

The Court's gatekeeping function pursuant to *Daubert* prevents simply "taking [Grabois'] word for it," nor can the Court accept Grabois' "bald assurance" that his opinion is reasonable and supported.  *See e.g., Daubert II,* 43 F.3d at 1319*, & W.R. Grace*, at 1187.  Grabois' bald opinion that $17,709,985.50 looks "reasonable and supported" to him is far too unreliable to be admissible, and Grabois' opinion should be excluded as a consequence.

Additionally, Grabois' damages opinion should also be excluded because it is a product of rampant speculation. Grabois copied his financial projections directly from Flagstone's investment prospectus, which Plaintiff Heath wrote. Heath speculated in his prospectus about a veritable mountain of financial projections. Heath speculated as to each of the following:

- the individual size of the lots (20 acres) and how many lots (585) Flagstone would be able to develop on the raw land it was seeking to acquire;

- how many of those lots Flagstone would be able to sell (all 585);

- what price those lots might bring in the open market ($65,000 in the first year, $68,000 in the second year, and $72,000 in the third year);

- how many "phases" of sales it would take to sell all of the lots at the prices projected (three) and how long each "phase" would last (one year each);

- realtors' commissions and closing costs on all lots sales ($3,919,000);

- the amount of all costs of developing the property physically ($7,657,000);

- the amount of all operating costs for the projected development ($5,756,000), including marketing, management, sales office, accounting, travel, and insurance costs;

- interest expenses and loan fees ($3,934,000);

- the amount of interest income from notes receivable Flagstone could earn ($3,243,000);

- the percent of all lots sales which Flagstone would finance for the lot buyer (60%);

- the terms Flagstone could obtain for its seller-financed lot sales, including the interest rate it could successfully charge (10.75%) and the minimum FICO score it would be able to get (580);

- the amount of its seller-financed lot sales it could finance in a hypothecation loan (80% of all seller-financed lot sales); and

- the management fees Flagstone could earn by managing the development from year one through year 18 ($660,000).

Grabois copied, adopted, and assumed **every** one of Heath's speculative projections. Grabois did not calculate any of his own projections, or attempt to test, verify, cross-check or compare Heath's projections to other similarly-situated projects. Grabois did not justify or support a single one of these speculative assumptions, nor did he provide a basis for any of them. Grabois just reviewed them and said they looked reasonable to him.

For instance, Grabois did not provide any evidentiary basis at all to support the assumption that Flagstone could have reasonably expected to sell approximately 12,000 acres spread across 585 twenty acre lots near Roundup, Montana, in a three year period. Grabois merely concluded that it seemed reasonable to him.

Grabois' opinion is exactly the type of "unsupported speculation" disguised as an expert opinion which Rule 702 and the *Daubert* standards deem inadmissible, and rightly so. Grabois blindly adopted over ten profoundly significant financial projections from Heath, the projections running the gamut from the number of lots for sale, to the lot sales prices in various sales phases, to the overall development costs, to the percent of the lots sales which would be seller-financed by Flagstone to generate allegedly millions in post-development cash flows. Grabois' damages opinion is truly little more than a thinly-veiled attempt to rubber-stamp Plaintiff Heath's own speculative projections in his investment prospectus. Grabois' opinion is the obvious product of unsupported speculation. It is decidedly inadmissible.

Finally, even if we assume for the sake of argument that it was acceptable under Rule 702 and *Daubert* for Grabois to simply copy and rely upon Plaintiff Heath's own speculative estimates in the investment prospectus, Grabois' damages opinion is nevertheless inadmissible because

the information he copied from the prospectus proved inaccurate and unreliable. Heath admitted in his deposition that his projections in the prospectus ended in "disarray" and were "completely undone" due to new planning requirements from Musselshell County which drove up the costs substantially, and significantly reduced the number of lots Flagstone could sell. (SOF ¶¶ 10-11) Heath even admitted in an email that the County's new planning requirements rendered his projected development "economically unfeasible." (SOF ¶ 12) Grabois relied upon the prospectus' projections anyway, which rendered his opinion unreliable and inadmissible. *See Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996) (expert opinion based on incorrect or fictitious facts properly excluded as unreliable).

## II.  SUMMARY JUDGMENT ON PLAINTIFFS' LOST DEVELOPMENTAL PROFITS DAMAGES CLAIM IS PROPER.

Even if Grabois' damages opinion was somehow reliable enough to be admitted, Plaintiffs' lost profits damages claim should still be dismissed. The undisputed material facts establish Plaintiffs' lost profits claim is so deeply mired in a mountain of Plaintiffs' own speculation about what their planned development "would" have sold, cost, and earned that the claim cannot survive summary judgment. American Title is entitled to summary judgment on Plaintiffs' damages claim as a matter of law.

It is well-settled that speculative testimony is generally inadmissible. *See Semenza v. Bowman*, 268 Mont. 118, 125, 885 P.2d 451, 455 (1994); *Cottrell v. Burlington Northern Railroad Co.*, 261 Mont. 296, 303, 863 P.2d 381, 385 (1993); *Williams v. Wallace*, 143 Mont. 11, 13, 386 P.2d 744, 745 (1963). Not surprisingly, it is also well-settled that a plaintiff cannot recover damages for alleged lost profits which are speculative. *See Stensvad v. Miners & Merchant Bank of Roundup*, 196 Mont. 193, 640 P.2d 1303 (1982).

11

Damages are only recoverable if they are "clearly ascertainable both in nature and origin," and alleged lost profit damages must be "reasonably certain" to be awarded. *See Id.* at 206, 640 P.2d at 1310.

Moreover, when the plaintiff has no record of past profits to cite to, such as in this case, the award of lost profits "may be sustained only if we can say that the profits are not based on speculation." *See Id.* Therefore, if "there is no reasonable certainty in the record that [the plaintiff] lost profits as the result of the wrong, or that a profit would have been derived at all," lost profit damages may not be awarded. *See Id.* at 206-07, 640 P.2d at 1310 (reversing award of $511,695 for alleged lost profits), *citing Tri-Tron Intern. v. Velto*, 525 F.2d 432 (9th Cir. 1975).

District Judge Donald Molloy recently considered an analogous lost profits claim in a lawsuit arising from a failed real property development. The case is entitled *Northwood Estates, LLC v. Wauer*, 36 Mont. Fed. Rep. 235 (D. Mont. 2008). Plaintiff Northwood purchased real property in Whitefish, Montana, with the intent of creating a ten-lot subdivision. Northwood subsequently sued the real estate agent and broker, alleging they failed to disclose a covenant restricting development of the land to six lots. Northwood sought damages for loss of projected profits. Northwood based its lost profits claim on two one-page cost and profit analyses. *Id.* The defendants moved for partial summary judgment on the proper measure of damages, arguing that Northwood's damages could not survive summary judgment because Northwood's lost projected profits claim was speculative and lacked sufficient factual support. *See Northwood* at 240.

Judge Molloy granted the defendants' motion for partial summary judgment on the proper measure of damages. Judge Molloy found

Northwood did not have admissible evidence in the record regarding the existence or amount of Northwood's alleged lost development profits. *Id.* at 246. More importantly, and relying upon *Stensvad*, *supra,* Judge Molloy ruled the "more fundamental reason why Northwood's claim for lost profits does not survive summary judgment" was because the claim was "hopelessly speculative." *Id.* at 247.

Plaintiffs' claim for alleged lost development profits is just as hopelessly speculative as the claim in *Northwood*, and it should be dismissed just as the claim in *Northwood* was dismissed. It is difficult to envision a more irretrievably speculative claim than Plaintiffs' alleged lost development profits claim. Plaintiffs' claim projects the sale of over $40,000,000 in 585 twenty-acre lots on land near Roundup, Montana, in only three years. Plaintiffs' claim projects the development being fully built and completed at a cost of over $25,000,000, and projects over $17,000,000 in profits for Plaintiffs. And all of Plaintiffs' projections occur in the midst of the collapse of the real estate market nationwide. Heath's financial projections create a speculative landslide that no lost profits claim could survive.

In short, Plaintiffs' lost development profits claim does not come close to being "reasonably certain." There is not a single component of the claim which is or was "reasonably certain." The only certainty here is that Plaintiffs have drastically over-reached. Therefore, under the standards set forth in *Stensvad* and *Northwood*, Plaintiffs' lost development profits claim utterly fails as a matter of law, and should be dismissed pursuant to American Title's Motion for Partial Summary Judgment.

Furthermore, should the Court exclude Plaintiffs' damages expert Grabois, as Rule 702 and *Daubert* mandate, Plaintiffs will lack any evidence

13

to support their lost profits damages claim, as Plaintiffs rely entirely upon Grabois' opinion to support their damages. Therefore, summary judgment on Plaintiffs' damages claim would be appropriate for the lack of evidentiary support, too. *See Northwood, supra*.

Indeed, dismissal of all of their causes of action against American Title could be justified on the basis that Plaintiffs cannot establish the necessary damages element for each of their causes of action against American Title (negligence, breach of fiduciary duty, tortuous interference with contract, and civil conspiracy). Summary judgment is proper when a plaintiff is unable to offer proof of any element of his claim. *See Hinkle v. Shepherd School District #37*, 2004 MT 175, ¶23, 93 P.3d 1239; *Roe v. City of Missoula*, 2009 MT 417, ¶35, 221 P.3d 1200. Moreover, where "a plaintiff presents evidence of damages which are purely speculative, summary judgment is appropriate." *See Berger v. State*, 215 Mont. 175, 179, 698 P.2d 399 (1985).

## CONCLUSION

For the foregoing reasons, American Title and Escrow's Motion to Exclude testimony or evidence from Plaintiffs' damages expert Dale Grabois, and American Title and Escrow's Motion for Partial Summary Judgment on Plaintiffs' damages claim should both be granted.

DATED this 7th day of August, 2011.

                MOULTON BELLINGHAM PC

                s/s Gerry Fagan

                Attorney for Defendant
                American Title and Escrow

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief is in 14 point type and contains 3,722 words, excluding caption, signature, Certificate of Service and Certificate of Compliance.

Dated this 7th day of August, 2011.

        MOULTON BELLINGHAM PC

        By: /s/ Gerry Fagan
           GERRY FAGAN/MICHAEL E. BEGLEY

        ATTORNEYS FOR DEFENDANTS
        AMERICAN TITLE AND ESCROW

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of August, 2011, a copy of the foregoing document was served on the following persons by the following means:

| | CM/EFC | Hand Delivery | Mail | Overnight Delivery Service | Fax | Email |
|---|---|---|---|---|---|---|
| Candace Payne<br>Matt Lancaster<br>Luxan & Murfit, PLLP<br>24 West Sixth Avenue, 4th Floor<br>P.O. Box 1144<br>Helena, MT 59624<br>Cpayne@luxanmurfitt.com | | X | | | | |
| David L. Charles<br>Daniela E. Olschlager<br>Crowley Fleck PLLP<br>P.O. Box 2529<br>Billings, MT 59103-2529<br>Dcharles@crowleyfleck.com | | X | | | | |
| Eric Edward Nord<br>Crist, Krogh & Nord, LLC<br>The Securities Bldg.<br>2708 First Avenue N, Suite 300<br>Billings, MT 59101<br>Enord@cristlaw.com | | X | | | | |
| Lynn M. Grant<br>Cashmore & Grant, PC<br>2722 3rd Avenue North, Ste. 321<br>Billings, MT 59101<br>Lgrantcashlaw@aol.com | | X | | | | |
| Mark D. Parker<br>Shawn P. Cosgrove<br>Parker, Heitz & Cosgrove, PLLC<br>P.O. Box 7212<br>Billings, MT 59103-7212<br>markdparker@parker-law.com<br>shawncosgrove@parker-law.com | | X | | | | |

|  | CM/EFC | Hand Delivery | Mail | Overnight Delivery Service | Fax | Email |
|---|---|---|---|---|---|---|
| T. Thomas Singer<br>Axilon Law Group, PLLC<br>115 North Broadway, Ste. 310<br>P.O. Box 987<br>Billings, MT 59103-0987<br>Tsinger@axilonlaw.com |  | X |  |  |  |  |
| Wayne Marchwick<br>Spring Pointe Memory Care<br>1400 Redwood Circle<br>Grants Pass, OR 97526 |  |  | X |  |  |  |
| John C. Breslo<br>The Breslo Law Firm<br>8426 East Shea Boulevard<br>Scottsdale, AZ 85260 |  | X |  |  |  |  |

MOULTON BELLINGHAM PC

/ s / Gerry Fagan
GERRY FAGAN

ATTORNEYS FOR DEFENDANTS
AMERICAN TITLE AND ESCROW

ND: 4823-7388-8010, v. 1