IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| FLAGSTONE DEVELOPMENT, LLC, an Arizona limited liability company, and LAWRENCE A. HEATH, | Cause No. CV-08-100-BLG-RFC |
| Plaintiffs, | |
| -vs- | **ORDER** |
| WAYNE JOYNER, JUSTIN JOYNER, as individuals; ROCKY MOUNTAIN TIMBERLANDS, LLC, a Montana limited liability company, WAYNE MARCHWICK, AMERICAN TITLE AND ESCROW, a Montana corporation, FIRST AMERICAN TITLE COMPANY, a California corporation, DEVELOPER FINANCE CORPORATION, a Massachusetts corporation, NICHOLAS POWERS, III, a/k/a NICHOLAS D. POWERS, JAKE KORELL, LANDMARK OF BILLINGS, INC., a Montana corporation, JON USSIN, U BAR S REAL ESTATE, a Montana corporation, and JOHN DOES 11 through 30, | |
| Defendants. | |

Currently pending before the Court Defendant American Title and Escrow's

Motion for Partial Summary Judgment on Damages and Motion to Exclude

Plaintiffs' Damages Expert Grabois.  Defendants U Bar S Real Estate, Jon Ussin,

Justin Joyner, Wayne Joyner, Rocky Mountain Timberlands, Nicholas Powers, III, and Developer Finance Corporation.

## UNDISPUTED MATERIAL FACTS

Plaintiffs have disclosed Dale Grabois as an expert on Plaintiffs' damages. Grabois has submitted his expert report and opines that Plaintiffs' total damages consist of lost development profits in the amount of $17,709,985.50.  Grabois' report states all of the alleged lost profits in one full page, but contains virtually no calculations.  Grabois states "the development would have brought in $40,150,000 in Gross Sales" and "[c]osts would have been $25,900,000."  However, Grabois does not provide any basis, authority or support to demonstrate how he came up with his Gross Sales or cost estimates.

It is readily apparent that the information upon which Grabois relied upon for his expert opinion came directly out of the Investment Prospectus prepared by Flagstone Development LLC and Lawrence Heath in late September to mid October, 2007 ("Prospectus" herein).  The Prospectus projected total gross sales of $40,150,000.  So did Grabois' report.  The Prospectus projected sales of 585 lots in three phases, with escalating lot prices in each phase from $65,000 to $68,000 to $72,000.  So did Grabois' report.

The Prospectus estimated development costs, including purchase costs, commissions, operating expenses, marketing costs, and loan costs of $25,900,00. So did Grabois' report.  The Prospectus estimated a gross profit of $14,250,000, and so did Grabois' report.  The Prospectus deducted a projected $865,000 interest payment, and split the remaining profit equally between the prospective investors and the developer in order to come up with a projected sales profit of $6,692,500. So did Grabois' report.

The Prospectus estimated "post-development cash flows" for years four through eighteen of $19,001,747.  Most of this estimated cash flow came from seller-financed lot sales, based on the Prospectus' estimate that 60% of all lot sales would be financed by Flagstone at 10.75% interest.  The Prospectus further estimated management fees in the amount of $660,000 which Flagstone could earn during the first eighteen years of development.  Grabois' report adopted and copied every one of these estimates.  Grabois' report also contains a 2% commission on every lot sale for Flagstone, as reflected in the Prospectus.[1]

---

[1]Grabois' report appears to contain a mathematical mistake.  The Prospectus, and Grabois, project total lot sales for all 585 lots to be $40,150,100, so 2% of lot sales would be $803,000.  Grabois calculated the 2% commission at $856,612.  Because the Grabois' report contains no exhibits, supporting calculations or other information supporting the commission calculation, the Court can only surmise this is an error in the report.

Grabois totaled up the six projections to come up with his "Total Lost

Profit" number of $17,709,985.50.

## ANALYSIS

### 1.      Should Grabois' Expert Opinion be Excluded?

Rulings on the admissibility of expert testimony under Fed.R.Evid. 702 are

in the sound discretion of the trial court.  *General Elec. Co. v. Joiner*, 522 U.S.

136, 118 S.Ct. 512, 517, 139 L.Ed.2d 508 (1997).  The issue is whether the

expected testimony of Grabois has sufficient reliability to be admissible under the

standards for expert testimony set out in *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Plaintiffs bear the burden of establishing the admissibility of Grabois' proposed

expert opinion testimony on damages.  *See Daubert*, *supra*, 509 U.S. at 592, n. 10.

If scientific, technical, or other specialized knowledge will assist the trier of

fact to understand the evidence or to determine a fact at issue, a witness qualified

as an expert by knowledge, skill, experience, training or education may testify

thereto in the form of an opinion or otherwise, if (1) the testimony is based upon

sufficient facts or data; (2) the testimony is the product of reliable principles and

methods; and (3) the witness has applied the principles and methods reliably to the

facts of the case.  Fed.R.Evid. 702.  The qualifications of an expert to be a witness

and the grounds for establishing the admissibility of his testimony must be proven by a preponderance of the evidence. *Daubert*, 509 U.S. at 592, n. 10. Some factors that may be considered in order to determine the admissibility of an expert's testimony include: whether the expert's theory or technique can be (and has been) tested, whether the theory or technique has been subjected to peer review and publication, the known or potential rate of error, and "general acceptance." *Id*. at 593-94.

The objective of *Daubert's* "gatekeeping" requirement is to ensure the reliability and relevancy of expert testimony; it is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Kumho Tire Co., Ltd. v. Carmichael*, 527 U.S. 137, 152 (1999). The trial judge must make a reliability determination on the record to fulfill the "gatekeeping" function. *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1066 (9th Cir.2002), *amended by* 319 F.3d 1073 (9th Cir.2003) (distinguishing cases where the district court made "explicit findings of reliability," from cases where there was a "complete failure to make any reliability finding").

The Supreme Court made it clear in *Daubert* that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.  Further, the advisory notes to the 2000 amendment make clear that, in accordance with the Supreme Court's directive in *Kumho Tire Co. v. Carmichael*, 527 U.S. 137 (1999), Rule 702 "is not intended to provide an excuse for the automatic challenge to the testimony of every expert."

The Supreme Court, the Ninth Circuit, and this Court have all ruled that admissible expert testimony does not include unsupported speculation and subjective belief.  *See Guidroz-Brault v. Missouri Pac. R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001), *citing Daubert* at 590; *see also, Claar v. Burlington Northern R.R. Co.,* 29 F.3d 499, 502 (9th Cir.  1994) (affirming exclusion of experts' opinion testimony because experts failed to demonstrate conclusions were based upon anything more than "subjective beliefs and unsupported speculation"); *United States v. W.R. Grace*, 455 F.Supp.2d 1181, 1187 (D.Mont. 2006).  It is well-settled that an expert's testimony should be excluded where it is based on subjective belief or unsupported speculation which amounts to no more than a bald conclusion (sometimes called an "*ipse dixit*" opinion) or guesswork.  *See General*

*Electric,* 522 U.S. at 146 (holding that trial court may properly exclude *ipse dixit*

opinions).

Additionally, an expert's opinion must be excluded if that expert is merely

"parroting" some other person's opinion rather than formulating his own.  *See e.g.,*

*Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.,* 285 F.3d 609, 612-614 (7th Cir.

2002) (expert not allowed to be "mouthpiece" of another person); *Villagomes v.*

*Lab. Corp. of Am.*, 2010 WL 4628085 (D.Nev. Nov. 8, 2010) (expert witness

cannot simply parrot opinions of non-testifying experts).

Grabois' proposed expert opinion on alleged damages incurred by Plaintiffs

is properly excluded.  Grabois formed his expert opinion on Plaintiffs' damages by

reviewing the Prospectus, copying down numbers from it, adding them up, and

stating they seemed "reasonable and supported" to him.  The Court's gatekeeping

function pursuant to *Daubert* prevents acceptance of Grabois' bald assurance that

his opinion is reasonable and supported.  *See e.g.*, *W.R. Grace*, 455 F.Supp.2d at

1187.

Grabois duplicated his financial projections directly from the Prospectus

that Plaintiffs wrote.  The Prospectus included the following financial projections

and speculations:

1.    The individual size of the lots (20 acres) and how many lots (585) Flagstone would be able to develop on the raw land it was seeking to acquire;

2.    How many of those lots Flagstone would be able to sell (all 585);

3.    What price those lots might bring in the open market ($65,000 in the first year; $68,000 in the second year; and $72,000 in the third year);

4.    How many "phases" of sales it would take to sell all of the lots at the prices projected (three) and how long each "phase" would last (one year each);

5.    Realtors' commissions and closing costs on all lot sales ($3,919,000);

6.    The amount of all costs of developing the property physically ($7,657,000);

7.    The amount of all operating costs for the projected development, ($5,756,000), including marketing, management, sales office, accounting, travel, and insurance costs;

8.    Interest expenses and loan fees ($3,934,000);

9.    The amount of interest income from notes receivable Flagstone could earn ($3,243,000);

10.    The percent of all lot sales which Flagstone would finance for the lot buyers (60%);

11.    The terms Flagstone could obtain for its seller-financed lot sales, including the interest rate it could successfully charge (10.75%) and the minimum FICO score it would be able to get (580);

12.    The amount of its seller-financed lot sales it could finance in a hypothecation loan (80% of all seller-financed lot sales); and

13.    The management fee Flagstone could earn by managing the development from year one through year 18 ($660,000).

Each one of these financial projections and speculations was adopted and assumed by Grabois.  Grabois did not calculate any of his own projections or attempt to test, verify, cross-check, or compare Heath's projections to other similarly-situated projects.  Grabois did not justify or support a single one of these speculative assumptions, nor did he provide a basis for any of them.  These are significant financial projections that cannot be adopted by Grabois as his own without research, support and justification.

Further, the information Grabois copied from the Prospectus proved inaccurate and unreliable.  Heath admitted in his deposition that his projections in the Prospectus ended in "disarray" and were "completely undone" due to new planning requirements from Musselshell County which drove up the costs substantially and significantly reduced the number of lots Flagstone could sell.  (Doc.  212, ¶ 10-11).  Heath admitted in an email that the County's new planning requirements rendered his projected development "economically unfeasible" (sic) (Doc.  212, ¶ 12).  Heath also admitted in an email the "numbers" no longer worked for his cash flow model following the engineering and planning requirement changes, and was due to few lots for sale, and lower sales values, among other issues (Doc.  212, ¶ 13).

Regardless of how many educated professionals assisted Heath in the

Prospectus, an investment prospectus is only a series of educated estimates at

future financial projections.  Even the Prospectus cautioned:

> Flagstone does not make any representations or warranties,
> expressed or implied, as to the accuracy or completeness of any
> of the information in their Investment Prospectus, or, in the
> case of projections, as to their attainability or the accuracy or
> completeness of the assumptions from which they are derived.

Doc. 212, Ex. 10.  Furthermore, the Prospectus warned it "is not intended to

provide the sole basis for any evaluation of Flagstone, the Transaction or the

interests offered in the Company." *Id.*

If the Prospectus was not complete or accurate when it was prepared, and if

Heath never intended from the start for anyone to rely solely upon it to evaluate

Flagstone's financial projections, the Prospectus does not later transform into a

sole and reasonable basis for Grabois' lost profits opinion.  Heath admitted the

Prospectus was not a reasonable basis to value Flagstone's projected development

when it was authored, and it is not a reasonable basis to value the projected

development now.

Grabois' proposed expert opinion on alleged damages incurred by Plaintiffs

must be excluded.

## 2.     Is Partial Summary Judgment on Plaintiffs' Lost Developmental Profits Damages Claim Proper?

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2).  An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party and a dispute is "material" only if it could affect the outcome of the suit under the governing law.  *Anderson, v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The party moving for summary judgment has the initial burden of showing the absence of a genuine issue of material fact.  *Anderson*, 477 U.S. at 256-57. Once the moving party has done so, the burden shifts to the opposing party to set forth specific facts showing there is a genuine issue for trial. *In re Barboza*, 545  F.3d 702, 707 (9th Cir. 2008).  The nonmoving party "may not rely on denials in  the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists."  *Id.*

On summary judgment, the evidence must be viewed in the light most favorable to the non-moving party.  *Id.*  The court should not weigh the evidence

and determine the truth of the matter, but determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.

A plaintiff cannot recover damages for alleged lost profits which are speculative.  *See Stensvad v. Miners & Merchant Bank of Roundup*, 196 Mont. 193, 640 P.2d 16303 (1982).  Damages are only recoverable if they are "clearly ascertainable both in nature and origin," and alleged lost profit damages must be "reasonably certain" to be awarded.  *See Id.* at 206, 640 P.2d at 1310.  When the plaintiff has no record of past profits to cite to, the award of lost profits "may be sustained only if we can say that the profits are not based on speculation."  *See Id.*

This case is analogous to *Northwood Estates, LLC v. Wauer*, 36 Mont.Fed.Rep. 235 (D.Mont. 2008) wherein Judge Molloy granted partial summary judgment because Northwood did not have admissible evidence in the record regarding the existence or amount of Northwood's alleged lost development profits.  *Id*. at 246.  Relying on *Stensvad, supra*, Judge Molloy ruled the "more fundamental reason why Northwood's claim for lost profits does not survive summary judgment" was because the claim was "hopelessly speculative."  *Id.* at 247.

Plaintiffs' claim for alleged lost development profits is as hopelessly speculative as the claim in *Northwood*.  The lost profit claim fails as a matter of

law.  Plaintiffs rely entirely on Grabois' opinion to support their claim of lost development profits.  Without Grabois, Plaintiffs' lack of tangible evidence to establish in the record a reasonably certainty that Plaintiffs would have derived a profit at all, as required by Montana law, is fatal to their lost profits damages claim.

Finally, and perhaps most difficult to overcome, is Heath's own admission that the new planning requirements from Musselshell County made his planned development "economically unfeasible" (sic).  This admission creates a problem for Plaintiff in that he was not even reasonably certain about the status of the development or its economic viability.

## CONCLUSION

Therefore, IT IS HEREBY ORDERED that the Motion to Exclude Plaintiffs' Expert Dale Grabois (Doc.  209) and Motion for Partial Summary Judgment on Damages (Doc.  210) are **GRANTED**.

DATED this 24th day of October, 2011.

*/s/ Richard F. Cebull*_____
RICHARD F. CEBULL
U.S. DISTRICT COURT JUDGE